UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JORGE DE JESUS MORAGA-VALDEZ, <br><br> Defendant. | Case No.: 21-cr-81-WQH <br><br> **ORDER** |

HAYES, Judge:

The matter before the Court is the Motion for New Trial filed by Defendant Jorge De Jesus Moraga-Valdez. (ECF No. 102.)

## I. Background

On December 11, 2020, Defendant, a Mexican citizen and United States Lawful Permanent Resident, applied for entry into the United States from Mexico through the Otay Mesa Port of Entry. (ECF No. 1 at 2.) Defendant was the driver and sole occupant of a vehicle bearing California license plates. A canine enforcement team alerted to Defendant's vehicle and further inspection of the vehicle revealed 43 packages of methamphetamine, weighing a total of 19.92 kgs (43.82 lbs), concealed in a compartment under the front driver seat and front passenger seat. *See id*. Defendant was arrested and charged by Information with a single count of importation of methamphetamine in violation of 21 U.S.C. §§ 952 and 960. (ECF No. 18.)

Defendant's trial on this charge began on September 21, 2021. After the jury was selected and impaneled, the Government called six witnesses on September 21, 2021, which comprised the Government's entire case-in-chief. (ECF No. 61.) The Government

called three Customs and Border Protection Officers establishing that they located 43 packages of methamphetamine hidden in two secret compartments in Defendant's vehicle and that Defendant answered biographical questions in a manner that the Government later argued was misleading. (*See* Tr. Trans. at 381–84, ECF No. 85.)

The Government also called a vehicle expert, who testified that the compartments were complex and would have taken approximately nine to ten hours to construct. (Tr. Trans. at 160, ECF No. 84.) The vehicle expert testified that, because of the compartments, the floor below the seats was elevated, which eliminated the normal gap between the floor and the front seats. *Id*. at 145. The vehicle expert testified that, because of the compartment, when the Defendant's car accelerated or braked, the seat would have moved. *Id*. at 151. The vehicle expert testified that he found an activated GPS tracker in Defendant's vehicle which could have disabled the vehicle and which supported two-way audio communication. *Id*. at 152–55. The vehicle expert testified that he found a "kill switch" which would have disabled the fuel pump and prevented anyone from stealing the vehicle. *Id*. at 155–56.

The Government called Homeland Special Investigations ("HSI") Special Agent Andrew Flood, who testified that he interviewed Defendant after his arrest. *Id*. at 174–75. Agent Flood testified that the vehicle Defendant was driving was registered to Defendant's wife, and at the time of his arrest, Defendant had two driver's licenses—one issued in California and one issued in Mexico—and two cellular telephones. *Id*. at 178–79. Agent Flood testified that Defendant told him that he worked as a "private contractor" painter but he did not tell him a name of anyone he worked for or a location where he worked. *Id*. at 176, 183.

The last of the Government's witnesses was HSI Special Agent Peter G. Kiesel, whose testimony is the subject of the pending Motion for New Trial. Agent Kiesel provided his background, training and experience including being the "lead case agent on over 200 narcotics investigations" and being the assistant or co-case agent on "well over 500 [narcotics investigations]." *Id*. at 201. After Defense Counsel performed a brief voir dire

examination of Agent Kiesel, the Court found Agent Kiesel's proposed testimony to be relevant and reliable and allowed Agent Kiesel to state an opinion pursuant to Federal Rule of Evidence 702 regarding the value of the seized methamphetamine and the modus operandi of drug trafficking organizations.[1] Agent Kiesel testified that the value of the methamphetamine seized was in the wholesale range of $29,984 to $74,960 and in the retail range of $49,974 to $179,904. *Id*. at 211.

Government Counsel then elicited from Agent Kiesel the following testimony: "Drugs are imported into the United States because the value increases substantially," *id*. at 211; drug trafficking organizations ("DTOs") smuggle drugs by "land, sea, or air," *id*. at 211–12; with respect to land crossings, DTOs "have [a] driver become familiar with the vehicle, make crossings with the vehicle, and then once the vehicle is loaded with the narcotics in it, they'll then have the driver drive the vehicle through the border into the United States to its intended destination," *id*. at 212; "people importing narcotics into the United States generally [are] compensated for their efforts," *id*.; and DTOs "generally [do not] entrust large quantities of narcotics to drivers who are unaware of the narcotics they are importing into the United States" "[b]ecause of the risk factor," and "[t]hey want the driver to be aware of what they are doing, when they are doing it, and making sure it

---

[1] The issue of the admissibility of Agent Kiesel's modus operandi testimony—including its relevance and reliability—was addressed in the motions in limine, at the pretrial hearing on the motions in limine, and outside the presence of the jury during the first day of trial. Although the admissibility of Agent Kiesel's modus operandi testimony is not at issue in the pending Motion for New Trial, the Court found that the Government had shown that this testimony was relevant and reliable (*see* Tr. Trans. at 101, 206, ECF No. 84; Motion in Limine Hearing Trans. at 3–9, ECF No. 83), and otherwise admissible pursuant to Ninth Circuit authority. *See United States v. Valencia-Lopez*, 971 F.3d 891, 901 (9th Cir. 2020) ("We do not question that expert modus operandi testimony is admissible in drug smuggling cases involving unknowing or coerced couriers."); *United States v. Sepulveda-Barraza*, 645 F.3d 1066, 1072 (9th Cir. 2011) ("[E]xpert testimony on drug trafficking organizations and the behavior of unknowing couriers is admissible when relevant, probative of a defendant's knowledge, and not unfairly prejudicial under the standard set forth in the Federal Rules of Evidence."); *United States v. Vallejo*, 237 F.3d 1008, 1016–17 (9th Cir.), *opinion amended on denial of reh'g*, 246 F.3d 1150 (9th Cir. 2001) ("We have allowed government agents or similar persons to testify as to the general practices of criminals to establish the defendants' modus operandi.").

happens." *Id.* at 213. Agent Kiesel testified that "the general process by which load cars are prepared in Mexico and delivered in the United States" is as follows:

> [O]nce the agreement has been made and the vehicle is ready to go … -- if it was in possession of the person who was going to be driving it, it would then be turned over to whoever their point of contact was, whoever might have recruited them, who is going to then take that vehicle. It will be driven to an unknown location, where the narcotics are then secured in the vehicle. Once the vehicle is ready to go, then it would be returned to the driver to then take the vehicle and drive it north into the United States.

*Id.*

On cross-examination, Defense Counsel elicited testimony from Agent Kiesel that importation of narcotics in a vehicle "doesn't always happen th[e] way" Agent Kiesel described it on direct examination. *Id.* at 214. Defense Counsel then engaged in the following exchange with Agent Kiesel:

> Q. And based on your experience, isn't it true that sometimes drug trafficking organizations smuggle narcotics by putting them into spare tires or vehicles without the drivers knowing?
>
> A. That is correct.
>
> Q. Isn't it true sometimes that drug trafficking organizations have attached magnets or included magnets with the narcotics and put them into the undercarriage of vehicles?
>
> A. Yes.
>
> Q. And isn't it also true that – and that is without the driver[']s knowledge; correct?
>
> A. That is correct.
>
> Q. And isn't it also true that sometimes drug trafficking organizations hire people as couriers for cash or couriers for money and in reality in fact they've smuggled narcotics without them actually knowing that they are smuggled narcotics; correct?
>
> A. Yes.

> Q. And isn't it true that there are also times where – or there have been times where an unknowing driver has smuggled in large quantities of drugs?
>
> A. Yes.

*Id*. at 214–15.

On the second day of trial, September 22, 2021, Defendant testified in his own defense. On cross-examination, Defendant was asked about a series of incoming and outgoing phone calls in the days prior to his arrest to a number saved in Defendant's phone as "Parisnte," which Defendant testified belonged to his brother Enrique. *Id*. at 295–300. Starting three days prior to his arrest, Defendant had several calls with "Parisnte" after crossing into the United States and then returning to Mexico. (*See* Gov. Tr. Ex. 49, SER-62.) On the morning of his arrest, Defendant had a 12-second call with "Parisnte" before crossing into the United States, and "Parisnte" did not call Defendant after Defendant's arrest. *Id*.

Defendant's wife testified during Defendant's case-in-chief. She testified that when she was interviewed by Agent Flood, she gave him the phone number of Defendant's brother Enrique, which was not the same phone number saved in Defendant's phone as "Parisnte." (Trial Trans. at 321, ECF No. 85.)

On September 23, 2021, after approximately two hours of deliberations, the jury returned a verdict finding Defendant guilty of importation of methamphetamine. (ECF No. 55.)

On May 16, 2022, the Court sentenced Defendant to the custody of the Bureau of Prisons for 120 months, followed by a five-year term of supervised release. (ECF No. 75.) At sentencing, the Court found that because Defendant elected not to meet with the Government to attempt to qualify for "safety valve" relief, Defendant was subject to a mandatory minimum custodial sentence of 120 months. (*See* Sentencing Trans. at 6–7, ECF No. 87; *see also id*. (Defendant "agree[d] that this offense is a minimum mandatory ten-year offense").)

On June 1, 2022, Defendant filed a Notice of Appeal. (ECF No. 77.)

In February 2023, the Office of Professional Responsibility ("OPR") for Immigration and Customs Enforcement learned that Agent Kiesel was using his work email to conduct a side business as a music disc jockey ("DJ"), though he had no "outside employment approval" on file at the time. (Gov. Ex. C at PO-000024.) An ensuing OPR investigation revealed many uses of Agent Kiesel's work email and work computer in furtherance of his DJ jobs. *See id.* at PO-000026–29, PO-000031–44. The investigation also revealed that Agent Kiesel had worked DJ jobs during his regular working hours and had taken paid sick leave while working DJ jobs. *See id.* at PO-000007–08. On June 7, 2023, Agent Kiesel submitted to an interview with two OPR investigators, during which Agent Kiesel admitted to conducting his DJ side business without HSI's knowledge, using his work email and computer to conduct that business, and taking paid sick leave to work DJ jobs. *See id.* at PO-000061–98. On September 20, 2023, Agent Kiesel was charged with having violated the following three HSI employment policies while conducting his DJ side business from August 31, 2022, to April 28, 2023: (1) misuse of government property; (2) abuse of sick leave; and (3) conduct unbecoming a law enforcement officer. *Id.* at PO-000007–09. The initial proposed penalty for Agent Kiesel was a 30-day suspension without pay. *Id.* at PO-000007. In response, Agent Kiesel "did not dispute any of the charges," "accepted responsibility for [his] actions and acknowledged [he] should not have engaged in such behavior," and "proactively [took] steps to correct [his] WebTA record" for his prior improper uses of paid sick leave. *Id.* at PO-000001. On November 29, 2023, after considering aggravating and mitigating factors, the Special Agent in Charge of the San Diego HSI Office imposed a penalty on Agent Kiesel of a 14-day suspension without pay. *Id.* at PO-000003.

On February 13, 2024, the Court of Appeals for the Ninth Circuit issued an Order granting the unopposed motion filed by the Government to remand for further proceedings in light of the results of the OPR investigation into Agent Kiesel. (*See* ECF No. 89.) The Court of Appeals stated that it "issues a limited remand for the district court to conduct any

proceedings it deems appropriate based on appellee's motion," and "[t]his appeal will be held in abeyance pending the limited remand." *Id*. at 1.

On February 26, 2024, this Court granted the Government's Motion for a Protective Order. (ECF No. 91.)

On March 18, 2024, the Government filed under seal a 246-page exhibit consisting of the OPR records relating to the investigation of Agent Kiesel. (ECF No. 94.)

On September 18, 2024, the Court issued an Order stating that, within 14 days, "the parties shall file a status report detailing the parties' respective positions regarding what additional proceedings, if any, are appropriate in this Court." (ECF No. 96 at 2.)

On September 30, 2024, the Government filed a Status Report. (ECF No. 96.) The Government asserted:

> After briefing was complete in the Ninth Circuit, the United States learned that one of its witnesses had been the subject of an internal investigation in 2023. Although the investigation began after the expert testified at Moraga-Valdez's trial, the United States moved the Ninth Circuit for a limited remand so it could produce the new impeachment information to defense counsel out of an abundance of caution. The Court granted the motion and issued "a limited remand for the district court to conduct any proceedings it deems appropriate."
>
> On remand, the United States provided defense counsel with the new impeachment information pursuant to a protective order on March 8, 2024. The United States also extended Moraga-Valdez a plea offer that would allow him to avoid the mandatory minimum sentence of 120 months and receive various guidelines concessions. Although the parties negotiated a plea for several months, Moraga-Valdez ultimately declined the plea offer and indicated he would be proceeding with a motion for new trial.

*Id*. at 2.

On October 11, 2024, the Court issued an Order requiring Defendant to file either a motion for new trial or other appropriate motion, or a response showing cause why the limited remand to this Court should continue. (ECF No. 97.)

1       On October 31, 2024, Defendant filed a Status Report and Motion to Extend Filing
2  Deadline for Motion for New Trial. (ECF No. 98.)
3       On November 5, 2024, the Court granted Defendant's Motion to Extend Filing
4  Deadline for Motion for New Trial. (ECF No. 99.)
5       On November 20, 2024, Defendant filed the pending Motion for New Trial. (ECF
6  No. 102.)
7       On December 19, 2024, the Government filed a Response in opposition to the
8  Motion for New Trial. (ECF No. 104.)
9       Although the Court granted leave for Defendant to file a reply by January 6, 2024,
10 the docket reflects that no reply has been filed.

**II.     Contentions of the Parties**

Defendant contends that Agent Kiesel was "[a]rguably the most important witness to the Government's presentation of evidence," who "served as the DTO expert, and provided the 'connect the dots' testimony for the Government's presentation of evidence." (ECF No. 102 at 1, 6–7.) Defendant contends that "Agent Kiesel's expert opinion contradicted Mr. Moraga's testimony/theory of defense," and "if the Jury believed Agent Kiesel, they could not believe Mr. Moraga's defense, and would have to convict." *Id*. at 7. Defendant argues that the OPR's investigation into Agent Kiesel and subsequent finding of misconduct "is proof of moral turpitude and acts of dishonesty committed by the Government's key witness at trial." *Id*. at 7. Defendant contends that "Agent Kiesel's testimony [at trial] had no … tangible support, which renders his credibility of paramount importance." *Id*. Defendant argues: "[I]f this Court grants a new trial, an acquittal is probable. If the Government calls Agent Kiesel again, his credibility likely will be so undermined that it is probable that a jury would acquit Mr. Moraga. Or, if the Government opted not to call Agent Kiesel, it is probable that the jury would acquit Mr. Moraga." *Id*. Defendant "request[s] that this Court order a new trial," or, "[i]n the alternative, Mr. Moraga requests this Court to order a hearing to develop the extent that the misconduct

detailed in [the OPR investigation of Agent Kiesel] occurred prior to Mr. Moraga's jury trial." *Id*.

The Government contends that the motion should be denied because "[t]he newly discovered material [of Agent Kiesel's misconduct] would not have had a powerful impact on Agent Kiesel's testimony," and "Defendant himself used questions to Agent Kiesel to support his own defense." (ECF No. 104 at 2.) The Government contends that, at trial, "[t]he circumstantial evidence of Defendant's knowledge was substantial—even without the testimony of Agent Kiesel—and the ability to ask a few additional questions on cross-examination, about a work-related discipline issue that had nothing to do with the facts of this case, would not have changed the outcome of trial." *Id*.

### III. Discussion

Defendant moves for a new trial pursuant to Federal Rule of Criminal Procedure 33, which states: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Because Defendant's motion for new trial is grounded on newly discovered evidence—i.e., the evidence of Agent Kiesel's workplace misconduct and discipline—it "must be filed within 3 years after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(1). Rule 33's time limit is not jurisdictional and may be forfeited if not timely raised by the Government. *See Eberhart v. United States*, 546 U.S. 12, 13 (2005). When the "government d[oes] not specifically object to [the timeliness of a defendant]'s new-trial claims below, … the government waive[s] its objection to the timeliness of those claims." *United States v. Berry*, 624 F.3d 1031, 1042 (9th Cir. 2010). As previously discussed in the Court's November 5, 2024 Order, the Court granted Defendant's motion for extension of time to file a motion for new trial—which itself was made over three years after the jury verdict—given the Government's failure to object to the timeliness of Defendant's request. (*See* ECF No. 99 at 3.) The Government again does not raise timeliness in response to Defendant's Motion for New Trial. Accordingly, the Court considers any objection to timeliness to be forfeited, and the Court considers Defendant's motion on its merits.

A party seeking a new trial on the basis of newly discovered evidence must "prove each of the following: (1) the evidence is newly discovered; (2) the defendant was diligent in seeking the evidence; (3) the evidence is material to the issues at trial; (4) the evidence is not (a) cumulative or (b) merely impeaching; and (5) the evidence indicates the defendant would probably be acquitted in a new trial." *United States v. Hinkson*, 585 F.3d 1247, 1264 (9th Cir. 2009) (en banc) (citing *United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005)). The Government does not dispute the first three factors in this case. (*See* Gov. Response to Mot. for New Trial at 10, ECF No. 104.) The evidence of Agent Kiesel's workplace misconduct and subsequent discipline was discovered while this case was pending on appeal; Defendant had no reasonable way to discover it earlier; and the Government does not dispute that the evidence would have been admissible to impeach Agent Kiesel at trial. Accordingly, the Court focuses on whether Defendant has proven the final two factors—that is, whether "the evidence is not … merely impeaching" and "the evidence indicates the defendant would probably be acquitted in a new trial." *Hinkson*, 585 F.3d at 1264.[2]

The Ninth Circuit has "held that when the effect of newly-discovered evidence is merely to impeach a witness, a new trial is unwarranted." *United States v. Davis*, 960 F.2d 820, 825 (9th Cir. 1992) (citing *United States v. Kulczyk*, 931 F.2d 542, 549 (9th Cir. 1991) ("[E]vidence that would merely impeach a witness cannot support a motion for a new trial."); *United States v. Alexander*, 695 F.2d 398, 402 (9th Cir. 1982) ("Evidence which is merely impeaching is not sufficient to support a motion for new trial.")). In *Davis*, the court clarified that there are situations in which newly discovered impeachment evidence may be sufficient to support the grant of a new trial:

> In some situations, however, the newly-discovered impeachment evidence may be so powerful that, if it were to be believed by the trier of fact, it could render the witness' testimony totally incredible. In such a case, if the witness' testimony were uncorroborated and provided the only evidence of an essential

---

[2] The evidence is not cumulative of any other evidence presented at trial. *See Hickson*, 585 F.3d at 1264.

element of the government's case, the impeachment evidence would be "material" under *Walgren*. Moreover, Rule 33 permits the granting of a new trial motion "if required in the interest of justice." If newly-discovered evidence establishes that a defendant in a narcotics case has been convicted solely on the uncorroborated testimony of a crooked cop involved in stealing drug money, the "interest of justice" would support a new trial under Rule 33.

*Id*. (quoting *United States v. Walgren*, 885 F.2d 1417, 1428 (9th Cir. 1989); Fed. R. Crim. P. 33(a)).

The Court finds that the newly discovered evidence of Agent Kiesel's workplace misconduct and discipline would have been "merely impeaching." *Hinkson*, 585 F.3d at 1264. The new evidence is entirely unrelated to the charge that Defendant imported methamphetamine and entirely unrelated to the subject matter of Agent Kiesel's testimony. The Court finds that the new impeachment evidence is not "so powerful that, if it were to be believed by the trier of fact, it could render the witness' testimony totally incredible." *Davis*, 960 F.2d at 825. Moreover, Agent Kiesel's testimony did not "provide[] the only evidence of an essential element of the government's case." *Id*. Agent Kiesel never opined as to Defendant's state of mind or knowledge, and Agent Kiesel couched his modus operandi testimony on what "generally" happens and "the general process" when drugs are imported by DTOs.[3] (Tr. Trans. at 211–13, ECF No. 84.) On cross-examination, Defense Counsel used Agent Kiesel to support the theory of the defense when Defense Counsel led Agent Kiesel to testify, among other things, that "sometimes drug trafficking organizations smuggle narcotics by putting them into … vehicles without the drivers knowing" and "there have been times where an unknowing driver has smuggled in large quantities of drugs." *Id*. at 214–15. In short, Agent Kiesel never testified about Defendant's knowledge specifically, and the modus operandi testimony was used by each counsel to support their respective theories.

---

[3] Agent Kiesel also testified as to the drug value, but this testimony was not objected to (*see* Motion in Limine Hearing Trans. at 8–9, ECF No. 83), and is not the focus of the Motion for New Trial. Even if it was at issue in the Motion for New Trial, the Court's reasoning and ruling would be the same.

The Government presented substantial evidence of Defendant's guilt, apart from Agent Kiesel's testimony. During closing argument, Government Counsel summarized "the points that the Government is going to highlight" during closing: "Command and control over the vehicle, defendant's untruthful misleading statements in primary and during the biographical questions, we got [the vehicle expert]'s testimony, we have Special Agent Peter Kiesel's testimony, we have the valuable meth, and today we also have the defendant's testimony." (Tr. Trans. at 378, ECF No. 85.) Government Counsel stated that "[t]he government is arguing each of these unites together to show the defendant's knowledge," *id*. at 378–79, which was the only contested element at trial. Government Counsel's closing argument comprises 40 pages of transcript, only five of which related to Agent Kiesel's testimony. *Compare id*. at 374–413 (Government Counsel's closing argument), *with id*. at 386, 391–93, 411 (Government Counsel's references to Agent Kiesel's testimony). Government Counsel did not reference Agent Kiesel's testimony during rebuttal argument. This illustrates how Agent Kiesel's testimony was not "the only evidence of an essential element of the government's case," and that the evidence of Agent Kiesel's workplace misconduct is not analogous to a situation where "newly-discovered evidence establishes that a defendant in a narcotics case has been convicted solely on the uncorroborated testimony of a crooked cop involved in stealing drug money." *Davis*, 960 F.2d at 825.

The Court also finds that the new evidence of Agent Kiesel's workplace misconduct does not "indicate[] the defendant would probably be acquitted in a new trial." *Hinkson*, 585 F.3d at 1264. Even assuming the Government called Agent Kiesel to provide the same modus operandi testimony at a new trial and Defense Counsel used the new evidence to impeach him, the Government asserts that "[a]ttempts to impeach Agent Kiesel … would not have gone unanswered." (ECF No. 104 at 13.) The Government asserts:

> Prosecutors on this hypothetical redirect would then have endeavored to elicit the fact that [Agent Kiesel] previously applied for agency approval for outside employment, he had a good-faith albeit legally insufficient reason for not doing so as to his DJ work (he believed he only needed approval for outside

>work by third-party employers), he never hid the fact of his DJ work, he immediately admitted his violation of HSI employment policies when confronted by OPR with contrary evidence, etc. All of which is to say that though he was in the wrong, the newly discovered impeachment would not have "so undermined [his testimony] that it is probable that a jury would acquit [Defendant]."

*Id.* (quoting Motion for New Trial at 7, ECF No. 102). Even apart from the Government's "hypothetical redirect," Agent Kiesel's modus-operandi and drug-value testimony was only one of many parts of the Government's case against Defendant, as discussed above. Even if the modus-operandi and drug-value testimony was removed from the Government's case entirely, the evidence would have been adequate to support the conviction. And as discussed above, Agent Kiesel's testimony was similarly utilized by Defendant in arguing that he did not know about the presence of drugs in his vehicle. As Defense Counsel stated in his closing argument:

>You recall when I asked [Agent Kiesel], has there been instances where drug trafficking organizations hide drugs in spare tires without the drivers knowing? Yes. Have there been instances where drug trafficking organizations with a magnet attached drugs to the undercarriage of a vehicle? Yes.
>
>I even asked him, has there been an instance where a drug trafficking organization entrusted an unknowing courier with a large amount of drugs? And his answer was yes. And this could very well be one of those times.

(Tr. Trans. at 420, ECF No. 85.) Given that Agent Kiesel never purported to opine on Defendant's state of mind, given the weight of the other evidence supporting the conviction, and given the support that Defense Counsel found in Agent Kiesel's testimony, the Court finds that Defendant has failed to show that Defendant "would probably be acquitted in a new trial," even if the Government recalled Agent Kiesel and the Defendant had access to the new impeachment evidence against Agent Kiesel. *Hinkson*, 585 F.3d at 1264. For these reasons, the Court denies the Motion for New Trial.

Defendant alternatively requests that "this Court … order a hearing to develop the extent that the misconduct detailed in [the OPR investigation of Agent Kiesel] occurred prior to Mr. Moraga's jury trial." (ECF No. 102 at 7.) Defendant has not alleged that Government Counsel or Agent Kiesel's supervisors at HSI were aware of the misconduct at any time prior to the jury verdict in this case. Defendant fails to show how or why the dates of Agent Kiesel's misconduct might alter the analysis of the relevant Rule 33 factors under Ninth Circuit caselaw. *See, e.g.*, *Hinkson*, 585 F.3d at 1264; *Harrington*, 410 F.3d at 601. Although not mentioned in the Motion for New Trial, to the extent Defendant seeks a hearing in an attempt to discover whether he might have an argument related to a potential violation of *Brady v. Maryland*, 373 U.S. 83 (1963) or *Giglio v. United States*, 405 U.S. 150 (1972), the Court would deny the request for the reasons discussed by the Hon. Cynthia A. Bashant in a similar motion for new trial based upon Agent Kiesel's misconduct in *United States v. Velazquez*, S.D. Cal. Case No. 17-cr-3707-BAS, Trans. of Aug. 19, 2024 Motion Hearing at 15–17, ECF No. 203, which was subsequently affirmed, *see United States v. Velazquez*, No. 22-50239, 2025 WL 252585, at *2 (9th Cir. Jan. 21, 2025) ("There was no *Brady* issue based on the newly discovered impeachment evidence because the investigation into Kiesel, which generated the newly discovered evidence here, did not start until after Velazquez's third trial."). Defendant's request for a hearing is denied.

The final issue is whether this Order should be filed under seal. The Court entered a Protective Order at the Government's request due to the personal information contained in Agent Kiesel's personnel files. (ECF No. 90.) The Motion for New Trial and the accompanying briefing and evidence were filed under seal pursuant to the Protective Order. In *Velazquez*, S.D. Cal. Case No. 17-cr-3707-BAS, the motion for new trial briefing and exhibits, which relied on the same evidence as the Motion for New Trial in this case, likewise were filed under seal pursuant to a protective order. The appeal documents related to the denial of the motion for new trial in *Velazquez* were filed under seal in the Ninth Circuit. However, in *Velazquez*, the transcript of the public hearing on the motion for new trial, including Judge Bashant's oral ruling denying the motion, is not sealed. *See* S.D. Cal.

1  Case No. 17-cr-3707-BAS, ECF No. 203. That publicly available transcript contains
2  discussion of the OPR investigation into Agent Kiesel's "extensive side business that he
3  was operating" without receiving proper authorization, including his use of Government
4  computers and "taking time off work, unauthorized, to do a side deejay gig," and discussion
5  of his 15-day suspension with pay. *Id*. at 6, 10, 14. Likewise, the Ninth Circuit opinion
6  affirming the denial of the motion for new trial is not sealed and is publicly available, and
7  contains reference to "245 pages of discovery from the investigation into Kiesel" and
8  addresses "whether the Government had knowledge of the misconduct" of Agent Kiesel.
9  *Velazquez*, 2025 WL 252585, at *2.

10  "The right of access to criminal trials is generally protected by both the First
11  Amendment and the common law." *United States v. Carpenter*, 923 F.3d 1172, 1178 (9th
12  Cir. 2019) (citation omitted). "[T]here is a First Amendment right of access to pretrial
13  documents in general." *Id*. at 1179 (quotation omitted). "This right can only be overcome
14  by an overriding interest that closure is narrowly tailored to serve that interest." *Id*. at 1178
15  (quotation omitted). "A separate, common law right to inspect and copy public records and
16  documents, including judicial records and documents also exists. This right, however, does
17  not apply to documents that have traditionally been kept secret for important public policy
18  reasons." *Id*. (quotation omitted). "Where a presumptive right of access under the common
19  law arises, that presumption can be overcome only by a showing of a compelling reason."
20  *Id*. at 1178-79 (quotation omitted).

21  Given the general right of public access to court records and the fact that much of
22  the information contained in this Order regarding Agent Kiesel's workplace misconduct
23  and discipline has been publicly available on the docket in *Velazquez*, the Court is inclined
24  to file this Order on the public docket without redactions. However, the Court gives the
25  parties the opportunity to brief the issue of whether this Order should be filed under seal
26  or publicly filed in a redacted format. Accordingly, this Order shall initially be filed under
27  seal and served upon counsel for the Government and Defendant. No later than fourteen
28  (14) days from the date this Order is filed, either party may file a brief showing cause why

this Order should remain under seal. If cause is not shown within 14 days, the Court will issue an order unsealing this Order.

### IV.  Conclusion

IT IS HEREBY ORDERED that the Motion for New Trial is denied. (ECF No. 102.)

IT IS FURTHER ORDERED that the Clerk of the Court shall file this Order under seal and immediately serve this Order upon counsel for the Government and Defendant. No later than fourteen (14) days from the date this Order is filed, either party may file a brief showing cause why this Order should remain under seal. If no briefs are filed within 14 days or neither party shows cause for continued sealing, the Court will issue an order unsealing this Order.

Following resolution of the issue of whether this Order should remain under seal, the Court will order the parties to notify the Ninth Circuit that this Court has concluded all proceedings it deems appropriate based on the Motion for New Trial. (*See* ECF No. 89.)

Dated:  January 27, 2025

Hon. William Q. Hayes
United States District Court